Good morning, Your Honors. My name is Gregory Kerr. I'm appearing here on behalf of the Plaintiffs and Appellants, National Federation of the Blind, and three prospective class plaintiffs. In this case, United Airlines is and has continued to discriminate against blind passengers. Counsel, let me ask you about my problem with your argument so you can address it squarely. Yes, sir. It looks to me as though there's implied field preemption of this California statute. California requires full and equal accommodation for disabled persons. Department of Transportation, under the Access Act, requires equivalent service. Equivalent service is different from full and equal. And also, for conflict preemption, the Department of Transportation says that it's good enough to give a blind person service at the front of the line and does not require a kiosk accessible to blind people. So if California does require a kiosk accessible to blind people, that would be conflict preemption. I frankly just don't understand how you get around the implied field preemption and the conflict preemption. I'll address that, Your Honor. First of all, as this Court has acknowledged and as Your Honor has written in various decisions, including Keen's and Ishikawa, you begin by looking at field preemption through the lens of there is a presumption, there is an inference against preemption, field preemption, when there is not only an express preemption provision as there is here, and obviously it's our argument that the claims survive express preemption, but also because there is a savings clause. And as the Supreme Court and the Ninth Circuit has made clear, that when you examine a preemption issue, you must begin with what Congress has said. And that is the key to understanding this entire statute. You're talking about the generalities now, but you still haven't addressed my specific problems of the difference between equivalent and full and equal and the conflict between the DOT saying you don't need a blind accessible kiosk and California saying you do. And I'm getting there, Your Honor. I will try and speed up. But, of course, this is I assume you began where you began because you seem to have some supervening argument that the two things you just said mean that field and conflict preemption don't matter. Is that essentially your argument? That if you have an express clause and a savings clause, you'd look at that, and if it's not covered, that's it, you win. No. It creates an inference, which I think is an important place to But you're not saying it's a per se. You're saying it creates an inference. That's correct, Your Honor. And the reason why I was beginning with that statutory framework, Judge Kleinfeld, is that you have to begin with the statutory text and what Congress intended. Now, when Congress first passed the FAA, it created the Civil Aeronautics Board, which regulated the airlines, and it also had a savings clause, which also allowed the States to regulate the airlines. Now, come in the 1970s And actually, the savings clause doesn't say and hasn't necessarily been interpreted that way. It says that there is not, doesn't preclude another remedy, is what it says. Well, actually, Your Honor, it goes beyond remedies. And as I'm explaining, the reason for, if you look at the progression of the statutes, it explains, in fact, that the savings clause does preserve substantive State obligations. And that is because, again, when the FAA was passed, it allowed the Federal and the State levels to regulate the airlines. Are you talking about section 4120C? That is correct, Your Honor. It just says a remedy under this part is in addition to any other remedies provided by law. It doesn't really save the effect of laws that may be different from or in conflict with. Well, if you look, Your Honor, if you look at the Supreme Court's decision in Wolins and the Ninth Circuit's decision in Charas, there is a recognition of the fact that when the Airline Deregulation Act was passed, again, it was passed to deregulate the airlines at the Federal level, but they also recognized that, wait a minute, the States have the ability to substantively, you know, create obligations for airlines. That is why the express preemption provision was needed. But as I read the cases, and I've been reading them a lot lately, they then branch off in two directions. One of them is the Charas direction, i.e., there are certain – there is a large realm of things that just isn't touched at all by Federal regulation. So, therefore, the States can, both with respect to the substantive standard and the remedy, proceed. And then there's a chunk of things as to which the – there is substantive preclusion, but perhaps not remedial preclusion, i.e., you may be able to get a remedy using the Federal standard under State tort law. But you're asking for something that's neither of those categories. You're asking to say that even if, as I understand it, there is an area of regulation with regard to your problem under Federal law, and then you – it's still the case that you're – both your different standard and your remedy survive. So, as I understand, you're beginning to look at the – My posit is that there are two, you know, sets of cases in which there's not preemption, but I'm not sure that you fit into either of them. Well, with respect to field preemption, this is – you know, it's not a tort claim, but it is certainly very analogous to the situation in Air Transportation Association versus the city and county of San Francisco, where, again, that statute was – or that ordinance was only creating the obligation for equality. The contractors of the airlines did not have to provide certain employee benefits, but if they were going to offer them, they had to do them on an equal basis. And that is not at all distinguishable from this circumstance, where the UNDER Act simply requires equality. It does not require that the airlines offer kiosks. It does not prevent them from offering kiosks. It simply says that if you were going to offer kiosks, you do it on an equal basis. I still have a problem. Are you saying that the regulation at 14 CFR 382.57 is ultra-virus? I'm sorry. I didn't catch the last word, Your Honor. Ultra-virus, outside the power of the agency? That's certainly one of the possible. But I think before you even get to that. I would have thought that it was pretty plain that Congress delegated to the agency authority to make regulations implementing the purposes of the statute, and that it was not outside the agency's powers. Well, Congress certainly gave the Department of Transportation the ability to regulate with respect to air transportation. Now, I look at the reg, and it specifically addresses kiosks. It says, what services must carriers provide if their automatic kiosks are inaccessible? That's this case. And it says, as a carrier, if your automatic kiosk is inaccessible, you must provide equivalent service to the passenger, e.g., that means exemplia gradia. Here, for example, by assistance from your personnel in using the kiosk, or allowing the passenger to come to the front of the line at the check-in counter. So it looks like the Federal Government has spoken with total specificity on exactly how to handle the problem of blind people and kiosks that are inaccessible to blind people. And the reason why that is not a problem and does not create a preemption issue in this case is because in passing the Air Carrier Access Act, Congress was specific that it was setting you floor. It was not concerned about State laws that provide greater access. It was concerned about those that would not provide that. Kagan. Where do you get that? Yeah. Where do you get that? It looks to me like all the lobbyists come together in a giant free-for-all and lobby out exactly what's going to be required so that they can determine how much money is going to have to be spent. And they do it all in Washington. So, Your Honor, in my reply brief, I've covered the issue, and I'm flipping to that so I can give you some specifics about how it set up the floor. But, again, the reason for the Air Carrier Access Act was because at the time that there was a lawsuit under the Rehab Act suing airlines, the Supreme Court said, no, you're not, airlines are not covered by the Rehab Act. So we're going to, you know, Congress came together and passed the Air Carrier Access Act, which, again, has its origins in the Rehab Act. So we understand from case law that the Rehab Act does not, you know, set a limit. It sets a floor for States to provide. But the point is that this reg is just a floor. When it says this is what you do, it means you have to do at least this much, and if some State requires you to do more, fine. Right, and that's correct. And that's the regulation actually contemplates that there could be kiosks that are accessible and says, you know, here's one thing you can do if they're not accessible. Again, the ---- It doesn't say here's one thing you can do, though. It says you must. It seems to say here is what you must do. At the very least, that is what must be done. And, again, the poll star of any preemption analysis is looking at what Congress said, what Congress intended. If you look at the legislative history ---- You know, that's kind of scary if you're on the wrong end of a reg. If you do something different from what the reg says, and your defense when the Feds come after you is I'm doing something more and better than what the reg says. And the Feds say, we don't think it's necessarily better. We just think it's different. We told you what to do, and you're not doing it. You're just leaving the blind people out there struggling with these kiosks, and you're not taking them to the front of the line or having somebody help them. Not good enough for us, even if the kiosk does have voice or Braille or something. So I don't really see how a carrier could reasonably follow the law under your conception of what the law is, that they have to do at least as well as what the reg says, but it's okay for them to do something different as long as it's better. Your Honor, I think actually the express language of the regulation is what prevents the heartburn on the part of the airlines and perhaps the DOT. Again, the regulation is worded in the terms of if it's not accessible. Now, there's certainly nothing about that phrasing that says, you know, you can't make it accessible, and that's really all this suit is about, is making sure that they're at least accessible. But to back up for a minute, you said that you were going to tell us from whence you conclude that these regulations are uniformly a floor and not pervasive or sufficient to occupy the field. Right. And, Your Honor, that's, again, that's the legislative history of the Air Carrier Access Act where the members of Congress were concerned about restrictions on access. They were worried about situations where there was not access. And so we must make sure, and this is throughout the legislative record, and Senator Dole is in the congressional record on this point exactly, which was actually quoted in the Department of Transportation's 1988 NPRM on the ACAA. They wanted to make sure that there were no non-safety related restrictions. That was the standard for Congress. They were worried about any restrictions that had no basis in safety. So, for example, if a state came up with some sort of provision that would have adversely affected safety, then that law is going to be preempted. But if it doesn't deal with safety, which, of course, kiosks do not, then that is a restriction. So your essential argument is that there is no field preemption under the ACAA, that there could be conflict preemption, I take it, if the states told you to do X when the Feds told you to do Y. But as long as you could do both, that's fine. That's correct. And as long as there could only be, and there's no dispute that there's any kind of impossibility conflict. No party in this case is arguing that there's a possibility. And there's certainly no conflict with the Federal objective. Again, because the Federal objective, as demonstrated by the legislative history, is that we want to make sure that we're promoting as much access as possible. Now, the Third Circuit case seems to me squarely to the contrary, saying that the ACAA essentially preempts everything about disabilities in airlines. We don't have a case directly on point that I know of, do we? Not that I'm aware of, Your Honor. But I certainly don't think that you need to look any further than, again, as the Supreme Court has instructed courts to do when examining preemption questions, to look at the legislative language, look at what Congress said, look at what Congress has intended. We don't need judicial gloss from other jurisdictions or from other cases. Well, the problem is that you're arguing for, I mean, it's an interesting argument, but it's essentially an argument that ordinary preemption provisions rules don't apply here. That's really what you're arguing. Because you're arguing that even, as I understand it, that even if one would otherwise see field preemption here, because of the particular history and evolution of this statute, it shouldn't apply. Well, actually, there is a very helpful case on point in the circuit, and that is the Montalvo case, which at 508 F. 3rd, 471. As I recall, it was Martin that kind of led up on Montalvo, but Montalvo seems to argue for broad field preemption. So actually, so what Montalvo said, specifically with reference to Your Honor's question and concern, is that pervasive regulations, again, we do not concede that there are pervasive regulations here, but even if you would assume that there were, pervasive regulations do not infer preemptive, you know, intent. They can, unless it appears from the underlying statute or its legislative history that Congress would not have sanctioned the preemption, and that, again, brings us back to the importance of the statute. I'm sorry. Would not have sanctioned. Would not have sanctioned, correct. Would it be correct under your argument that if the airline provided kiosks that had instructions in Braille, plus if you touched it, it would give you voice instructions, then the airline would not have to provide assistance from its personnel in using the kiosk, nor would it have to let the blind people come to the front of the line at the checkout counter? Yes, Your Honor. That would provide exactly the kind of quality that the UNRU act asked for. So if we got that, that's your theory of what makes it accessible to blind people. Now, the feds apparently have a theory that what makes it accessible to blind people is either having personnel assist them or else letting them come to the front of the line at the check-in counter. So I suppose we could then get a class action from blind people saying, we've been deprived of our express regulatory right to come to the head of the line or have airline personnel assist us. Because even though whoever the plaintiffs were in that class action thought it was good enough that we should get Braille and voice, it's not good enough. Airports are noisy. It's hard to hear the voices. Your Honor, actually, I don't think that's quite right because the regulation specifically says if it is not accessible, these are the things that you do. You allow people to go to the front of the line. You have someone assist them. That creates a distinction. That actually highlights that a kiosk is not accessible if someone has to recruit a third party to help them or they have to go to the front of the line because they can't actually use the machine. Why could anyone safely assume that it would be accessible if it had the changes that the plaintiffs in this particular case want? Because in other contexts, for example, in ATMs, which are a very similar kind of machine, there is extensive case law that talks about accessibility of those machines. It deals with the independent access, the customer being able to do the same thing. But I thought your basic point was that the Federal regulation is written such that if it's otherwise accessible, you don't have to do these things. That's correct, Your Honor. So that's why there's not a conflict. Correct. And that's why it isn't true that anybody is going to be confused about whether they have to follow the Federal rule as long as they — because the Federal rule only applies in the absence of access. That's correct, Your Honor. Okay. That's exactly what the — and I see my time has joined those five. Thank you very much. Thank you. You will have about two minutes left. Thank you. May it please the Court, I'm John Neckerlein for United Airlines, and I'd like to cede eight minutes to the United States. How much time? Eight. Eight. Okay. Well, please watch your time. I will try to help you do it, but go ahead. The issue in this case involves three different issues of preemption. I'm going to focus first on field preemption, and if I have time, I will turn to the other two theories of preemption. In 1986, Congress enacted the ACAA to create greater consistency and predictability in access to air travel for people with disabilities, including procedures. Well, I thought the argument on the other side, as I understood it, was sort of interesting. And I gather it would be that it wasn't — what they were really doing was reacting to the Supreme Court case that says that 504 doesn't apply, and they were essentially enacting a 504 for the airlines. And that 504 is not — and the ADA — the other ADA, the Americans with Disability Act that was later enacted, are not, quote, field preemptive, i.e., they are floors. So you began asserting that this was for increased predictability and so on, but where are you getting that from? I mean, what it was really for was to deal with the fact that the Supreme Court had just passed a federal statute dealing with airlines. So this statute is airline-specific. It addresses only airlines whether they're accepting Federal money or not. I'm getting it from the same Senate report that my opposing counsel has cited. I will read a relevant passage. The section is also intended to express Congress's intent that the inconsistency in services presently being offered by different air carriers or by the same air carrier on different flights be reduced or, where possible, eliminated. That's on page 4 of the Senate report. On page 2 of the Senate report, you also see expressions of concern that policies for accommodating the handicapped vary from airline to airline and can vary within any one airline. So these are — Do you need this legislative history to make your case? No, I do not, because the field preemption is ultimately predicated on a comprehensive scheme. I once had lunch with one of my Senators, and somebody came over to lobby him while we were having lunch, and he assured him that he'd try his best, and if he couldn't get it in the bill, he'd get it in the legislative history. And then he turned to me after the guy left and said, ignore legislative history. It's the consolation prize for what we give people who didn't get it in the bill. In fairness, two responses to that. One is the other side has opened the door to a discussion of the legislative history. And my point is that the legislative history has, as one of its core focuses, the need to bring greater consistency and predictability to access for people with disabilities to air travel. But field preemption is not that the — I would imagine that the disability lobbies wrote the legislative history and staffers agreed to drop it in, and nobody voted on it or signed it in the White House. Either way, the — to the extent the legislative history matters, it cuts for us rather than against us. Ultimately, field preemption in this context, as in Dela Cuesta or Morales — I'm sorry, or Montalvo, ultimately arises from a pervasive scheme that Congress told DOT it had to enact under this statute. Kagan. Now, are you arguing that the ACA regulations are generally preemptive, as I understand it, in the third circuit as held, of everything about disabilities in airlines? Or are you saying that this particular regulation and the fact that the Federal regulations specifically address kiosks and blind people? I'm saying both of those things. The first one goes under — Well, the first seems a little extreme. Well — You don't need the first. Is that right? I would modify your articulation of the first in the following respect. The ACA preempts the field of access issues that DOT focuses on. So if DOT is focusing on an access issue, it preempts the field with respect to that and all of the other issues. So if, for example — Why do you need anything that broad? I'm sorry? Why do you need anything that broad? Why aren't we just talking about kiosks? Well, first of all, the Court properly looks to the agency to define the field that is preempted. And since 1990, this agency, after notice and comment, has concluded that it has a finely-reticulated scheme that preempts the entire field of access by people with disabilities to their travel. Now we're getting into more and more arcane and interesting things that I'm not sure we need to decide. But I had thought the Supreme Court in recent years has been fairly skeptical about deference to agencies with regard to their preemptiveness. I think it depends on the context. So there are some contexts when agencies show up for the first time in litigation and articulate a position they've never — Oh, no, not in any event. In any event, because the question of how Federal and State regulations interact is not really exactly the agency's problem. Actually, I simply disagree with this. I mean, in Geier and in Spritzma, the Supreme Court gave strong weight to the agency's  And I don't think that the agency's views on preemption get weight in any of the cases that respectively in the Geier case. I remember the control — the controller of the Freshery cases in which the Supreme Court seemed to say, you know, we're — we don't think this is really worth a whole lot, the agency's preemptive decision. So — and it was also the fact — I'm sorry? There are various indicia that you use, the courts use, to determine whether agencies' views on preemption get weight. One is whether it's a longstanding and consistent view. Another is whether it was a view adopted at the conclusion of a notice and comment rulemaking proceeding. Both of those conditions are satisfied here. In the cases where the Supreme Court, for example, in the Wyeth case, where the Supreme Court did not defer to the agency's view, it was because it concluded that the agency had not been consistent over time and had not announced its position at the conclusion of notice and comment. I also want to — I want to elaborate a bit more on why it makes sense for there to be field preemption in this context. There are a couple of reasons. One is the logic of plaintiff's position here is that if there is not field preemption, that 50 different state legislatures or regulatory agencies could impose 50 different schemes of access by the visually disabled to kiosks. Those kiosks could, under different state regulatory schemes, involve different specifications.  Sotomayor, I mean, what's interesting about the kiosk, I mean, you can certainly see with regard to airlines, since they're flying from one place to another, that this could be a big problem for some purposes, for things having to do with what's going on on the airplane. But the kiosks are staying in one place. They're not going anywhere. So, therefore, it's not clear why the airlines aren't entitled to any more uniformity than anybody else in terms of — I mean, this is true, for example, of other international companies with regard, for example, to ADA — to local ADA statutes. Generally, they may be subject to different accommodation rules for their employees in San Francisco than New York, right? That is correct. Air travel has always been deemed different. As this Court found in Montalvo, there is no presumption against preemption in the aviation context. And also, it may be true that kiosks don't move, but people do, and they make round trips, and they fly in various places. They've become accustomed to a very — to a particular technology in getting access to an airplane, boarding and the check-in procedures. Congress — the reason Congress passed this Act was to ensure consistency and predictability for people as they travel around the country. But let me interrupt you for just a second. 382.7 or .57 says that a carrier may provide equivalent services to the passenger, parentheses, e.g. by assistance from your personnel using the kiosk or allowing the passenger to come to the front of the line to check-in counter. Now, that doesn't — that doesn't say that the airline must provide services for a disabled passenger by assistance from your personnel or by allowing them to come to the front of the line. It simply says you must provide equivalent service, right? Now, is there any reason why equivalent services would not be something other than assistance from personnel and bringing them to the front of the line as required by California laws? Well, as I understand the plaintiff's case here, personal assistance wouldn't satisfy their state law claims because they are looking for accessible kiosks. In other words, they are not looking for equivalence in treatment. They are looking for the same machine to be accessible to them. Right. Isn't that equivalent service? That is equivalent service. It would be equivalent service to do that or it would also be equivalent service to rely on individuals near the kiosks. I guess what I'm getting at is, isn't it possible that California itself defines what equivalent service is in connection with air carrier traffic operations, which is — which is different than that which is provided for by example in 14 CFR 382.57? Correct. And it is DOT's responsibility to ensure national consistency in ultimately determining what sorts of very expensive kiosks need to be deployed in air — But why don't they just simply say that? Why doesn't 382.57 specifically say, this is what you will provide? Because then that clearly — that would — that would preempt any state law that's different, wouldn't it? Well, as in all cases of field preemption, there are various state law claims that are preempted without an express statement by an agency or by Congress of preemption. You know, Judge Benitez's question raises an interesting point that I hadn't thought of before. At the regulation, the CFR, it says EG. It doesn't say IE. If it said IE, that is, it would mean, here's what you have to do for blind people. Either have somebody help them or bring them — or let them come to the front of the line. But it doesn't say IE. It says EG. Correct. So it says equivalent services. For example, they could do this or this. And that does not necessarily rule out alternatives the way IE would. So why isn't the California idea or the — or the plaintiff's idea, voice-operated kiosks or kiosks that talk in a loud enough voice so you can hear them over the airport noise, why isn't that another equivalent service for Federal purposes and also an equal service for California statutory purposes? I mean, as a practical matter, the airlines are waiting for there to be a consistent national standard on kiosks before investing the millions of dollars needed to deploy them. So the — You know, I wonder, though, whether the law really says they're entitled, that they'd be the same all over. I'm thinking in some parts of the country, you'd want a lot of them to talk in Spanish as well as English. And in some parts of the country, you probably would not want to burden the English-speaking blind people with the Spanish language because there's nobody around there who speaks Spanish, though there may be some people who speak some other foreign languages. With respect, this is why DOT has a consistent national regime, because there's a national perspective on these issues. I don't think it's fair to say exactly that it has to be uniform. But your time — you've used your time, just so you know it. So you can go on or not. I'm sorry. I'd like to answer your question. Judge Kleinfeld. You were asking a question. I just asked for a cite. Where does it say that the airlines are entitled to a uniform kiosk designed? This is — there are two — well, there are three arguments that we've raised here. First of all, there is express preemption under the ADA, which I haven't gotten to. Our arguments in our briefs. Field preemption, you rarely have an express statement by Congress. That's why you have field preemption. Otherwise, if an express statement were required, there wouldn't be such a thing as field preemption. Which requires us to figure out what the field is. Correct. And in this case, the field gives appropriate weight to what the agency says the field is. There's another point that I want to make here before I sit down. And I think that you — both of these are evident on the face of the agency's 2011 supplemental notice. One is that in all these decisions, the agencies make extremely specific and extremely rigorous cost-benefit analyses for the particular technologies that they're going to impose on the airlines. That's what the argument is about. And it is an argument on a nationwide basis. That cost-benefit analysis reflects a considered congressional policy choice that, in fact, does impose both a floor and a ceiling. But, Counsel, I'm sorry, and I hate to take up your time, but that seems to be inconsistent. What you're saying is that the agency has conducted studies, has figured out what the costs would be, and is now deciding that they're going to impose these requirements on the airlines and no more. But that's inconsistent with 382.57, because it doesn't provide any express limitations or any express requirements. It is consistent. It doesn't provide equivalent services. Because that is a question of what airlines must do as a result of government mandates. Airlines are free to invest in kiosk technologies if they want to. The reality is that they are waiting for there to be a single national standard. The last thing the airlines want to do is invest millions of dollars in kiosks before finding out what the federal standard will be, because that will potentially reduce the scale economies that enable them to do this efficiently. And it will also – that concern also illustrates the general reason why it is appropriate to conduct cost-benefit analysis on a nationwide basis. If I understand you correctly, then you're saying that a state cannot impose any kind of requirements or restrictions on a kiosk. The state cannot impose restrictions on kiosks that are within the subject area that DOT focuses on. So if a state wanted to say that kiosks must use green technology, for example, that would not necessarily be preempted by federal law. What is preempted by federal law is a state decision to say what technical specifications kiosks must have under state law, even while the federal government is poised to issue nationally uniform regulations on that issue. Thank you very much. Thank you. Thank you for a useful argument. We'll give you an extra two minutes, so let's say six minutes. Thank you, Your Honor. Good morning. May it please the Court. I'm Christine Cole from the Department of Justice on behalf of amicus United States. I wanted to begin by touching on something that Mr. Nectarline alluded to at the end of his presentation, and that is the ongoing rulemaking at the Department of Transportation as we speak. This is the issue that's involved here with respect to the accessibility to visually impaired persons, their accessibility to airport kiosks. It's a matter of not whether there will be requirements in the future that address the needs of visually impaired persons in this respect, but when. But if that's the case, counsel, let me just interrupt you on that. If that's the case, until such time as those regulations are issued, why can't the State of California impose its own regulations that supplement or attempt to accommodate 14 CFR 382.57? Well, the answer to that, Your Honor, is field preemption. Congress made it very clear when it enacted the Air Carrier Access Act. When did it make it very clear? Well, it's obviously it's not expressly stated, but that's the whole thing. Not so obviously. Sorry, Your Honor. It's oxymoron. But that's the essence of field preemption. It's implied. And I think when you look at it. I made it very clear. I made it very unclear. So let's start again. Well, the Air Carrier Access Act provision itself, when you look at it in its totality, it does several things. First of all, it prohibits discrimination against persons with disabilities in providing air transportation. And it's not just air transportation. It's in providing air transportation, which encompasses an entire range of activities. Secondly, the Air Carrier Access Act directed the Department of Transportation not authorized, but directed the Transportation Department to issue regulations to implement that statute. And in addition to that. Well, I mean, it's interesting to hear your argument against the background of 504 and the Americans with Disabilities Act as to which all of this is true. I mean, everything you're saying. That is not the same agency, but there are federal agencies that issue regulations and tell people what they have to do to have access. And sometimes at a fairly high level of specificity with regard to public facilities and so on. But the understanding there, as I understand it, I mean, explicit understanding is that there is no – that the states can legislate also. So against that background, why should we be assuming that the airlines are different? Your Honor, my understanding, and I'm not an expert on the Rehabilitation Act or the other ADA, but my understanding is the same as yours, and that there is generally, generally no field preemption. But that's because there are provisions in those statutes that are worded very differently. Now, here there's a – here there is basically a vacuum, right? I mean, at most there's a vacuum. In this case? Yes. Yes. Well, I mean, this is a situation where Congress was very explicit in directing the Department of Transportation to issue regulations. So I'm saying I don't think you can really get out of that, because it's also true with regard to the Americans with Disabilities Act and 504. But 504 and the other ADA, again, have these provisions that explicitly preserve the authority of states to legislate in that area. I understand. But all I'm saying is that I'm making a narrow point, which is I don't see – I'd like to be illuminated as to why in this instance, simply from the fact that the agency is directed to issue regulations, we should infer anything. Well, it's not simply that. Again, if you look at the Access Act itself, it does several things in addition to directing the Department of Transportation to issue these regulations, which it has done and continues to do. It also directed the Department of Transportation to conduct investigations. There's no private right of action under the Air Carrier Access Act. If there's a violation of it, the complaining party has to go through the Department of Transportation. And there's a very detailed complaint mechanism that would eventually lead to administrative proceedings in that area. Counsel, tell me something about the proceedings that would ensue in an arguable violation. Hypothesize an air carrier that decides they'd like to do it the way that the plaintiffs in this case advocate, because they don't like spending the money on personnel to run over there when they see somebody who may be blind and help them. And they don't like having extra square feet so blind people can come to the front of the line. So what they do is they equip their California kiosks with Braille and with voice. And the voice is loud enough so you can hear it in the noisy airport and it's clear enough so the blind people know what to do. Under 382.57, does the Department of Transportation then launch some sort of proceeding against the airline for failure to comply with that reg for assistance or front of the line? Can it proceed against the airline? What happens? Well, in the hypothetical you suggest, there wouldn't be a violation of the regulation because, as Your Honors have pointed out, the current regulation, which is an interim regulation, does give the airline some flexibility in this regard. So there is nothing to preclude a carrier if it wants to make that kind of investment and provide just in the State of California or elsewhere, for that matter, the kind of kiosks that the appellants are seeking. You know, the Department of Transportation isn't going to preclude that, but it is in tension with the intent of Congress that there be uniform and consistent and predictable regulation in this area. Where does it say that? Well, that again is reflected in the legislative history. You know, we're not relying solely on legislative history, but as Mr. Nectarline pointed out, the appellants opened the door to that. Could the airlines lobby as heavily as they could for something that would give them the advantage of national uniformity? It's vastly more efficient, as counsel or the defendant said. Actually... Anywhere but the history? Actually, I think it was mostly the disability community that lobbied, if you will. So they both wanted uniformity. They wanted... And predictability. Let's not overlook that. And there's another important point. I see my time is up, but... No, please continue. It's a very important point, and that is when the agency is considering the regulations in this area, it has to be concerned about a whole range of disabilities. It's not simply kiosks that are accessible to the visually impaired. The kiosks have to be accessible to individuals with mobility problems. Your Honor, Judge Kleinfeld raised a very good issue about people who speak different languages and how that would affect kiosks that have an audio component. So this is the entire range of issues that the agency is dealing with, and this is precisely what Congress intended when it enacted this very specific legislation in 1986 to deal with these issues. Can I ask one last question, which I asked your co-counsel, and that is, is the government's position that the ACAA broadly preempts everything, having everything that the agency could issue regulations on with regard to disability and airlines, or is it that it preempts everything having to do with kiosks, or is it, I mean, exactly what is the breadth of your position? Well, it's certainly much more than kiosks. If you look at Part 382 regulations overall, it is... Well, I understand that, but I mean, are you, but there are two ways you could go about this. You could look at each set of regulations and say, what field is this preempting? Or you could say, as I understand the Third Circuit has said, but our court hasn't held yet or hasn't addressed, that basically everything about the accommodation of disabled people in airlines is substantively, although not remedially, preempted. Is that the government's position? It's essentially the government's position. The best way I can answer your question, Your Honor, is to refer to what the agency stated back in 1990, I believe, when it issued its first final set of regulations under the Air Carrier Access Act. And it said, this is a detailed, comprehensive national regulation based on Federal statute that substantially, if not completely, occupies the field of nondiscrimination on the basis of handicap and air travel. Well, that's not much of a position. It's substantially, if not completely. But as we explain in the brief, and we discuss this on page 12 of our brief, that doesn't mean that the Federal Government doesn't view this area as field preempted and also conflict preempted. The reason for that language, it just simply very prudently the government recognizes that there may well be circumstances in the future that we can't predict in which there may be an area in which there is no preemption. Preemption, as I'm sure your honors are aware, is an issue that the government has long taken very seriously. There's no, the only thing consistent about the government's position on the preemption area is that we examine that issue based on the circumstances of each individual case. We have argued to this Court in other cases involving airline issues, for example, that there is no preemption. So there's no one-size-fits-all theory for this. Everything requires very specific examination. And in this case, based on this statute, primarily, not exclusively, but primarily the Air Carrier Access Act, the government feels that Congress spoke quite clearly in its direction as to what it wanted the Department of Transportation to do, and the department has done that and continues to do it. And again, this is a matter of not whether there will be kiosks that address the needs of visually impaired persons more specifically than the current interim regulation does, but rather when. Okay. Thank you very much. Thank you for your helpful argument. Thank you. Sir, we will actually give you three minutes in rebuttal time  Thank you, Your Honor. Now, as my counterpart in the government was just talking about Congress's clear message and instructions, I'm here looking at an entry from the congressional record when the Air Carrier Access Act was being debated and one of the sponsors, Senator Cranston, was talking about the need to fill the gap left by the Supreme Court's decision that in the paralyzed veterans case that the Rehab Act didn't apply to the airlines. And the Air Carrier Access Act was that gap filler. It was the 504. And your position, I gather, is that the uniformity that Congress intended was a uniform floor, essentially. That's precisely correct. In order for United and the amici to be correct, Congress had to have been concerned about more access. It had to have been concerned about, you know, consistency in terms of greater access. The problem that I have with it is floor is a metaphor. There is no floor. There is no ceiling. There is no better. There is no worse in the geographic senses that the metaphor implies. The difficult thing is saying what's equal, what's equivalent. A blind person's access can never be equal fully because a blind person can't see. As for what's equivalent, it's a matter of difficult judgment. For example, voice raises the problem of language. It raises the problem of volume and it raises the problem of hearing impairments. Height is a real problem because of wheelchair accessibility. Once you get out of some uniform national specification, which may be good and it may be bad and it's probably going to be good for most people and bad for some people, once you get out of that, I don't see how anything can be satisfactory. Well, the reason why that's not a concern is... I mean, you can have it in Spanish, voice Spanish and English, and somebody comes up to the kiosk who speaks Yiddish and Russian and he's blind and he has no idea what he's supposed to do. So, Your Honor, again, the idea being that there is certainly an opportunity for the states to improve access. Now, of course, we would agree that if there is anything that provides less access, if the states were to say, you need only provide A and the government regulations say you need to provide B and B is the higher level, then of course there will be... What's higher? The problem is higher is a metaphor. There is no higher. Well, certainly, in this particular instance, Your Honor, there is a very distinct difference between what is higher and what is lower. At present, our clients cannot access... What are we going to do for blind people if we go your way? I think we're going to give them voice, right? Well, there are certainly several different ways to make them accessible. One of them is for audio feedback, so that when a person touches the screen... So, if I'm blind, I just touch something and it starts talking to me. It will speak to you and you would have earphones that are plugged into the kiosk. I have my earphones and I happen to speak one of the 140 languages that's spoken in Papua New Guinea. That's also true of writing as well. Right. But in that case, it's not providing less than what the federal standard is. It's at least providing as much. You mentioned ATMs before. Somebody mentioned ATMs before. What is the current regime with regard to ATMs? I assume it is that they are public accommodations or they're public facilities and that the Americans with Disabilities Act applies and basically, which is somewhat amorphous in terms of there aren't regulations, I assume. Actually, Your Honor, there are ADAG. The 2010 ADAG actually covers a lot of the aspects of access to ATMs. And is there any case law that those are not preemptive? I assume they're not preemptive because the whole ADA is not preemptive. Correct, Your Honor. The states are free to do more. That's correct, just as they are here because Congress's intent was to make sure that there is at least a minimum amount of access and certainly, if states go on to provide an accessible kiosk. In some sense, the airlines are asking to be special privileged characters because this particular statute was before the ADA, actually. That's correct, Your Honor. That's correct. Really, and this comes down to our Federalist system that permits the states to improve upon access and, again, the legislative history here allows just that by making sure that, you know, the consistency they were concerned about was consistent access. It wasn't, you know, well, we don't want to prevent people from I mean, the problem I'm having with trying to understand how this fits in with the whole statute is the fact that airlines fly around. Kiosks don't, but airplanes do. And in terms of how you would take similar concepts to the ones you're arguing for and transport them, which I didn't mean to be a pun, to if the issue was how blind people have to be treated with regard to the screens on airplanes, I think you'd have real problems because the airlines, the airplanes fly around. So who's going to be regulating that? Well, Your Honor, I think that In other words, the concepts, the statute doesn't distinguish between static and in the air as such. Correct. And I think that what the issue is is, of course, where is that where is that flight originating from would probably have some bearing on it. Of course, I happen to be acquainted with somebody who only speaks Armenian. She gets along fine in her town in California because everybody there speaks Armenian. It's pretty much an Armenian town. And I suppose you could make the kiosk accessible to her if she were blind. She's not, but, you know, she could be. You could make it accessible if you tap it three times and you get Armenian. But then, if she flies to Fairbanks, Alaska, where I don't think we have a single Armenian, she taps the kiosk three times, it's not going to talk Armenian. Right. So if in that case So you're saying all the kiosks all over the U.S. have to speak Armenian? There are several thousand other languages. No, Your Honor. What I'm saying is that there is no conflict. There's and that's the context of our discussion right now. There's no conflict for a state to say you must provide an accessible kiosk to a blind passenger and that is more than what the current answer to this hypothetical is that the statute doesn't cover language disabilities. And that's why if she was not blind and she put on the kiosk it still doesn't speak Armenian. Right. But if she's blind it wouldn't be accessible to her if it spoke out loud but it didn't speak in Armenian. My point, Your Honor, is though as long as the state law is not mandating something that is less than what the Federal mandate is, then there's no conflict. It would require the state to say you don't use kiosks at all, airline. They're not permitted when in fact what the ACAA says is that you can't. Could I have an answer to my question about what is the scope of your argument as it applies to non-stationary objects with regard to the airlines and then could you please terminate your argument? I would say at that point because the airplane is in the act of travel that may actually possibly be a service that falls that is squarely within the express preemption realm which I know we haven't discussed and that's certainly discussed at length in our briefs but I don't think that that would even get to the conflict issue. Okay. Thank you both very much. Thank you, Your Honor. It's a really interesting case. I appreciate your arguments and the case of National Federation of the Blind for the United Airlines is submitted and we are in recess. Thank you. As I said, it will be a fairly lengthy recess before the next and last case on the calendar. Thank you.
judges: Benitez, Kleinfeld, Berzon